UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No. 11-197** |
| Plaintiff, | **COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER EQUITABLE RELIEF; JURY TRIAL DEMANDED** |
| v. | |
| FEATURE FILMS FOR FAMILIES, INC., | |
| CORPORATIONS FOR CHARACTER, L.C., | |
| FAMILY FILMS OF UTAH, INC., and | |
| FORREST SANDUSKY BAKER III, individually and as owner and principal officer of FEATURE FILMS FOR FAMILIES, INC., CORPORATIONS FOR CHARACTER, L.C., and FAMILY FILMS OF UTAH, INC., | |
| Defendants. | |

Plaintiff, the United States of America, acting upon notification and authorization to the

Attorney General by the Federal Trade Commission ("FTC" or "Commission"), pursuant to

Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its

Complaint alleges:

1.       Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19(a) of the

FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b(a), and Section 6 of the

Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15

U.S.C. § 6105, to obtain monetary civil penalties, a permanent injunction, and other equitable

relief from Defendants for their violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and

the FTC's Telemarketing Sales Rule (the "TSR" or "Rule"), 16 C.F.R. Part 310, as amended.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,

1337(a), 1345, and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57b(b).  This action

arises under 15 U.S.C. § 45(a).

3.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) and 1395(a), and 15

U.S.C. § 53(b).

## DEFENDANTS

4.     Defendant Feature Films for Families, Inc., ("FFF") is a Utah for-profit corporation with

its principal place of business located at 5286 South Commerce Drive, Suite A116, Murray,

Utah.

5.     Defendant Corporations for Character, L.C., ("C4C") is a Utah for-profit corporation

with its principal place of business located at 5286 South Commerce Drive, Suite A116, Murray,

Utah.

6.     Defendant Family Films of Utah, Inc., ("Family Films") is a Utah for-profit corporation

with its principal place of business located at 5286 South Commerce Drive, Suite A116, Murray,

Utah.  Family Films provides services to Defendants FFF and C4C, including management

services and directions on regulatory compliance with respect to telemarketing conducted by

Defendants FFF and C4C.

7.     Defendant Forrest Sandusky Baker III ("Baker") is the president and chief executive

officer of FFF, the chief executive officer of C4C, and the chief executive officer of Family

Films.  Baker also owns FFF, C4C, and Family Films, directly or as Trustee of the Forrest S.

2

Baker III Trust and co-trustee of the Sharon O. Baker Trust. At all times material to this Complaint, Baker has had the authority and responsibility to prevent or correct unlawful telemarketing practices of FFF, C4C, and Family Films, and has formulated, directed, controlled, or participated in the acts and practices of FFF, C4C, and Family Films, including the acts and practices set forth in this Complaint.

8.     At all times relevant to this Complaint, Defendants have maintained a substantial course of conduct in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

9.     Defendants transact and have transacted business in this District by selling DVDs to consumers in this District; by making telephone calls to consumers in this District to induce the sale of DVDs and theater tickets; and by soliciting potential donors in this District for charitable contributions. Defendant C4C is registered as a professional solicitor pursuant to the Florida Solicitation of Contributions Act, Fla. Stat. Ch. 496, and has contracted with purported charities in this District to solicit for contributions. In the course of telemarketing for contributions and to induce sales, Defendants have made or caused telephone calls to be made to consumers and potential donors in this District, including calls that violate the FTC Act and the TSR as described below in Counts I through VII.

### DEFENDANTS' BUSINESS ACTIVITIES

10.     Since at least 2007, Defendants have engaged in or caused others to engage in telemarketing through plans, programs, or campaigns conducted to induce the purchase of goods or services, and to induce charitable contributions, by use of one or more telephones and which involve more than one interstate telephone call.

3

11.   FFF acquires, produces, and distributes family-friendly films on DVD.  FFF also initiates telephone calls to consumers in the United States to induce the sale of theater tickets or the purchase of FFF DVDs.  Defendant FFF is both a "seller" and "telemarketer" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

12.   C4C initiates telephone calls to consumers in the United States to induce the purchase of FFF's goods or services, and to solicit contributions for purported charities.  Defendant C4C is a "telemarketer" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

13.   Family Films employs the management personnel for FFF and C4C, including the sales managers, financial personnel, and telemarketing compliance counsel.  Family Films employees supervise and direct the sales and telephone solicitation activities of FFF and C4C.  Defendant Family Films is both a "seller" and "telemarketer" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

14.   Defendant Baker, as owner and chief executive of FFF, C4C, and Family Films, has been involved in conceiving telemarketing campaigns, drafting the telemarketing scripts used by FFF and C4C employees, and deciding whether the telemarketing campaigns conducted by FFF and C4C should include calls to telephone numbers on the National Do Not Call Registry maintained by the Commission under 16 C.F.R. § 310.4(b)(1)(iii)(B) (the "National Do Not Call Registry" or "Registry").

15.   Defendants FFF, C4C, and Family Films have operated as a common business enterprise (hereinafter, "the Family Films Enterprise") while engaging in the deceptive acts and practices and other violations of law alleged below.  Defendants in the Family Films Enterprise have shared personnel, managers, telephone numbers, telecommunications services, Internet domains, and other resources in conducting the telemarketing campaigns described below, and have

4

shared a common business location in Murray, Utah.  Because these Defendants have operated

as a common enterprise, each of them is jointly and severally liable for the deceptive acts and

practices and violations of law alleged below.

16.     Defendant Baker is jointly and severally liable for the conduct of Defendants FFF, C4C,

and Family Films because he has had the authority to control and direct the activities of these

Defendants, has had knowledge of the misrepresentations and other misconduct of these

Defendants, and has participated in approving or ratifying the practices that resulted in the

abusive pattern of telephone calls made by the Defendants in the Family Films Enterprise.

### Telemarketing to Promote FFF DVDs and Baker's Movie

17.     Defendants FFF and C4C, at the direction of Family Films, have conducted telemarketing

campaigns to promote the sale of DVDs distributed by FFF or movies produced by Baker.  In

conducting this telemarketing, Defendants have repeatedly made telemarketing calls to telephone

numbers listed on the National Do Not Call Registry, and have conducted campaigns without

taking steps to prevent calls from being made to telephone numbers on the National Do Not Call

Registry.

### 1. Telephone Calls by C4C Selling FFF DVDs

18.     In 2008 and 2009, C4C conducted a nationwide calling campaign under the name "Kids

First," which is part of a trademark used by the Coalition for Quality in Children's Media

("CQCM"), to signify its approval of children's programming.  The telephone calls were made

pursuant to agreements that provided that C4C would make survey and solicitation calls for

CQCM and allow CQCM to retain at least 7 percent of the revenues generated by C4C's sales of

DVDs to consumers during these telephone calls.  The agreements allowed FFF to receive up to

93 percent of the revenues generated by C4C's telephone calls, in addition to shipping and

handling costs, and gave C4C the right to use information obtained during the campaign for

C4C's own purposes, including marketing and solicitation.

19.     The telephone calls made by C4C under the name Kids First were made in connection

with "telemarketing" as defined in 15 U.S.C. § 6106(4) because they were part of a program

conducted to induce the purchase of FFF's DVDs and involved more than one interstate

telephone call.

20.     During 2008 and 2009, C4C representatives, using recordings or reading from scripts,

made telephone calls to carry-out this campaign and identified themselves as "with Kids 1st."

The recordings and scripts did not identify C4C or FFF as sellers or entities on whose behalf the

calls were being made.

21.     During 2008 and 2009, C4C representatives made telephone calls in which they stated

that they were just calling to offer to send the recipient of the call two complimentary DVD

movies, and to request that the recipients give feedback on whether the movies should be

included in a list of recommended movies.  The C4C representatives did not disclose during

these initial calls that those who accepted their offer would receive a call soliciting them to

purchase additional movies.

22.     During 2008 and 2009, C4C representatives made follow-up telephone calls to persons

who had agreed to accept the complimentary DVDs.  During this second call, C4C

representatives asked the recipient of the call whether his or her family enjoyed the movies and

offered the recipient the opportunity to purchase two additional movies for $12.95 each, plus

shipping and handling charges.  If the recipient declined to purchase two movies, the caller urged

him or her to purchase one movie.  In addition, C4C representatives told recipients of these calls

6

that the producers of the films wanted to give them a $5 credit that they could use toward the future purchase of FFF products.

23.     During 2008 and 2009, when the C4C representatives offered to sell DVDs during the follow-up call, they told the recipients of the call, "[a]ll the proceeds of this fundraiser will help us finish up creating this recommended viewing list to help parents and grandparents, like us, with a list we can trust."  The C4C representatives did not disclose that proceeds collected from the sale of DVDs would be paid to Defendants C4C or to FFF.

24.     FFF or C4C received at least 93 percent of the total proceeds collected from recipients of the calls that C4C made using the name Kids First during 2008 and 2009.

25.     In making telephone calls under the name Kids First in 2008 and 2009, C4C did not prevent calls from being placed to telephone numbers listed on the National Do Not Call Registry and did not limit calls to persons who had previously purchased or inquired about FFF products.  C4C representatives told recipients of the calls that they were calling "every number in your area."

26.     In making calls under the name Kids First, C4C initiated telephone calls to more than five million telephone numbers of persons who had placed their numbers on the National Do Not Call Registry before the telephone call.

### 2. FFF Telephone Calls Promoting *The Velveteen Rabbit*

27.     In early 2009, a film produced by Baker, *The Velveteen Rabbit*, was screened in theaters nationwide prior to its release on DVD.

28.     Prior to and during the period that *The Velveteen Rabbit* was screened in theaters, FFF representatives made approximately eight million unsolicited telephone calls to households in areas where the movie was being screened.  The FFF representatives encouraged the recipients

7

of the calls to purchase tickets to see the film, and stated that producers of the movie would give the consumers an incentive to purchase a ticket.  In some telephone calls, the FFF representatives stated that the producers would give the recipient of the call a credit toward the purchase of FFF DVDs equal to the cost of the movie ticket.  In some calls, the FFF representatives told consumers that the producers of the movie guaranteed that the recipients of the call and their families would enjoy the movie and, if not, the recipients of the call could choose a free DVD movie from the producers' library.

29.     The telephone calls made by FFF to encourage ticket sales for *The Velveteen Rabbit* were made in connection with "telemarketing" as defined in 15 U.S.C. § 6106(4), because they were part of a program conducted to induce the purchase of theater tickets and FFF's DVDs, and involved more than one interstate telephone call.

30.     In making telephone calls to encourage ticket sales for *The Velveteen Rabbit,* FFF did not prevent calls from being placed to telephone numbers listed on the National Do Not Call Registry and did not limit calls to persons who had previously purchased or inquired about FFF products.  FFF told recipients of the calls that they were calling "every combination of numbers in the areas where" the movie was opening.

31.     In making telephone calls to encourage ticket sales for *The Velveteen Rabbit,* FFF initiated telephone calls to more than two and a half million telephone numbers of persons who had placed their numbers on the National Do Not Call Registry before the telephone call.

32.     In making telephone calls to encourage ticket sales for *The Velveteen Rabbit,* FFF representatives began the calls by announcing that they were calling "on behalf of the producers of a great new movie coming to theaters and this is not a sales call."  FFF representatives responded to consumers who asked who is calling by saying that they were "calling on behalf of

8

the producers of a new movie called the Velveteen Rabbit." The recordings and scripts used by FFF to conduct these calls did not identify FFF, Family Films, or Baker as the seller behind the calls.

33.     In making telephone calls to encourage ticket sales for *The Velveteen Rabbit,* FFF arranged for the phrase "VELVETEEN" or "VELVETEENMOV" to be transmitted to caller identification services as the name of the party making the call.

### 3. FFF Telephone Calls to Sell DVDs

34.     FFF regularly places telephone calls to induce the sale of FFF DVDs to persons who, according to FFF, have previously purchased products from FFF or have made inquiries about FFF products as part of a telemarketing program.

35.     FFF has made telephone calls to induce the sale of FFF DVDs to persons whose telephone number is listed on the National Do Not Call Registry even though the person has not made a purchase from FFF in the eighteen (18) months preceding the telephone call, and the person has not made any inquiry regarding FFF's products in the three months preceding the telephone call.

36.     Since June 1, 2007, FFF has made approximately nine million telephone calls to telephone numbers that were listed on the National Do Not Call Registry at the time of the telephone call, in circumstances where FFF's records do not show that the recipients of the calls had purchased FFF's products or services during the eighteen (18) months immediately preceding the telephone call, or had made an inquiry about FFF's products or services during the three (3) months immediately preceding the telephone call.

37.     In the course of initiating these telephone calls to induce the purchase of FFF DVDs, Defendants arranged for names other than C4C, FFF, or Baker – such as "CUSTOMER SVC

FE" and "FAMILY VALUE CB" – to be transmitted to caller identification services as the name of the entity calling the consumer.

**Telemarketing for Contributions**

38.     C4C, as a professional solicitor, initiates telephone calls to request contributions on behalf of organizations with names related to fraternal police organizations and firefighting, in campaigns that involve more than one interstate telephone call.

39.     By contract, the organizations pay most of the donations received to C4C as fees and retain 15 to 33% of the money donated.

40.     C4C has conducted solicitations for organizations that use all or most of what remains of the contributions after deducting C4C's fees to pay salaries or operational expenses of the organizations, or pay debt incurred because of such salaries or expenses, rather than using the contributions for charitable activities.

41.     In soliciting contributions for organizations with names related to fraternal police organizations and firefighting, C4C has represented in telephone calls to potential donors that:

      a.     the organization for which C4C is soliciting provides law enforcement training, safety-related officer training, bullet proof vests, death benefits, or financial assistance to families of officers killed in the line of duty, firefighters, or victims of fires or disaster;

      b.     "any support you [the potential donor] can give goes to" or "goes directly into" safety-related officer training, providing supplies like bullet proof vests, aid to families, fire and disaster victims, or other charitable programs described by C4C representatives during the solicitation;

     c.     a specific percentage of every contribution goes to fund law enforcement training, death benefits, and assistance to families of officers killed in the line of duty; and

     d.     the full amount recorded by C4C as a pledge during a prior telemarketing call "was actually budgeted" for assistance to police officers or their families, volunteer fire departments, the victims of fire and other disasters, or other charitable programs described by C4C representatives during the solicitation.

42.     In soliciting contributions for organizations with names related to fraternal police organizations and firefighting, if a potential donor expressly or implicitly asks how much of a contribution goes to C4C, C4C representatives respond by stating that:

     a.     the representative does not know the exact amount of administrative costs, but knows "it's a very minimal amount";

     b.     the amount of contributions going to the organization's charitable efforts has doubled because the organization recently hired a new fundraising company that decreased administrative costs; and

     c.     the amount of donated funds that went to the organization was less in the past but recently doubled or almost doubled.

43.     C4C's representations in the telephone calls described in Paragraph 41 and 42 imply that the entities for which C4C is soliciting devote more than an incidental portion of the contributions received from donors to the charitable activities described during the telephone solicitation.

44.     C4C has made the representations described above in Paragraphs 41 through 43 in soliciting for organizations that, in fact, provide no funding for the activities described during the

telephone solicitation, or devote only an incidental portion of the contributions received from donors to such activities.

45.     C4C has made the representations described in Paragraph 42 in telemarketing campaigns for organizations that spend significant amounts of the contributions received on telemarketers, overhead, staff and associated costs; have not hired a new fundraising company that has decreased administrative costs; and have not doubled or nearly doubled the percentage of contributions that go to the organization or its charitable efforts.

46.     In soliciting contributions for organizations with names related to fraternal police organizations and firefighting, C4C representatives encourage potential donors to immediately authorize payment, rather than wait for the arrival of written materials, by stating that if the donor authorizes payment over the telephone by credit or debit card, more of the donor's support will go to local officers, to the victims of fires, or other charitable programs, "as opposed to the administrative costs."

47.     In fact, under C4C's contracts to conduct charitable solicitations, a donor's agreement to immediately authorize payment over the telephone does not increase the fraction of the donation that goes to the organization or its charitable programs.

**Do-Not-Call Requests Directed to the Family Films Enterprise**

48.     Consumers and potential donors who have received telemarketing calls from C4C and FFF have responded by telling C4C and FFF representatives that they do not wish to receive such calls again.

49.     In numerous instances, Defendants in the Family Films Enterprise have initiated, or caused to be initiated on their behalf, telephone calls to the telephone numbers of persons who

12

have previously responded to telephone calls from FFF or C4C on behalf of the same seller or charitable organization by stating that they do not wish to receive such calls.

**Family Films Enterprise's Use of Predictive Dialer Technology**

50.    In the course of the telemarketing described above, the Family Films Enterprise uses predictive dialers to automatically initiate telemarketing calls to consumers and potential donors before a representative is available to speak to a consumer or potential donor who answers the automated call.

51.    In the course of the telemarketing described above, in numerous instances, the Family Films Enterprise has not had a sufficient number of representatives to speak to all the persons who answer telephone calls made by its predictive dialers.  As a result, the Family Films Enterprise has abandoned the telephone calls that it initiated by failing to connect a call answered by a person to a representative within two seconds of the person's completed greeting.

**VIOLATIONS OF SECTION 5 OF THE FTC ACT**

52.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts or practices in or affecting commerce.

53.    Misrepresentations or omissions of material fact likely to mislead consumers acting reasonably under the circumstances constitute deceptive acts or practices prohibited by Section 5 of the FTC Act.

### <u>COUNT I</u>
*Deceptive Representations*

54.    In numerous instances in the course of making calls to consumers and potential donors, Defendants in the Family Films Enterprise represented that:

a.   a representative calling under the name of Kids First is just calling to request the call recipient's review of movies for a recommended movie list;

b.   all the proceeds from the sale of DVDs by the representatives calling under the name of Kids First will be used to help finish up creating a recommended viewing list;

c.   the organization on behalf of which the representative is calling to solicit contributions uses and will use more than an incidental portion of the contributions to provide law enforcement training, safety-related officer training, bullet proof vests, death benefits or financial assistance to families of officers killed in the line of duty, firefighters, or victims of fire or disaster;

d.   any contributions received from donors go to, or go directly to, particular charitable programs described during the telephone call;

e.   a specific percentage of every contribution goes to fund law enforcement training, death benefits, and assistance to families of officers killed in the line of duty;

f.   the full amount of a prior pledge has been "actually budgeted" for charitable programs described by C4C representatives;

g.   the amount of the contributions that C4C or the organization for which it is soliciting uses for administrative costs is a "very minimal amount;"

h.   C4C or the organization for which it is soliciting has recently hired a new fundraising company that decreased administrative costs;

i.   C4C or the organization for which it is soliciting has recently doubled or almost doubled the percentage of contributions that goes to the charitable organization for which contributions are being solicited; and

14

j.     if the donor authorizes payment over the telephone by credit or debit card, more of the donor's support will go to local officers, the victims of fires or other charitable programs, "as opposed to the administrative costs."

55.   In truth and in fact,

a.     the representatives who made calls under the name Kids First were not just calling to request reviews of movies, but to sell DVDs to persons who agreed to review movies, and offer credits to encourage future purchases of FFF's DVDs;

b.     not all proceeds from the sale of DVDs by the representative calling under the name of Kids First were used to create a recommended viewing list as at least 93 percent of the proceeds were paid to FFF and C4C to purchase and ship DVDs;

c.     the organization for which the representatives solicited contributions did not engage in the charitable activities described to donors in C4C's solicitations for the organization, or the organization for which the C4C representatives solicited contributions devoted only an incidental portion of contributions to such activities;

d.     the contributions from donors that Defendants solicited did not go directly to charitable programs described during the telephone call, and most of the contributions go to pay Defendants for telemarketing, salaries, and operating expenses of the organization on behalf of which Defendants are soliciting;

e.     the percentage of contributions solicited by C4C that went to fund law enforcement training, death benefits and assistance to families of officers killed in the line of duty was materially less than the percentage that C4C represented when it solicited donors;

f.      the organizations for which C4C solicits do not budget the full amount of a pledge to C4C for the charitable programs described by C4C representatives, and, in fact, pay C4C two-thirds or more of any donations induced by C4C's telephone solicitations;

g.      a significant amount of the contributions received as a result of C4C's solicitations is used for payments to telemarketers, operating expenses, and other costs that donors reasonably regard as administrative costs;

h.      neither C4C nor the organization for which it is soliciting has recently hired a new fundraising company that decreased administrative costs;

i.      neither C4C nor the organization for which it is soliciting has recently doubled the percentage of contributions that goes to the charitable organization; and

j.      a donor's agreement to authorize payment over the telephone does not increase the percentage of the donation that goes to the organization for which C4C is soliciting or its charitable programs.

56.      Therefore, the representations described in Paragraph 54 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE
## AND THE NATIONAL DO NOT CALL REGISTRY

57.      Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

16

58.     It is a deceptive telemarketing act or practice, and a violation of the TSR, for any seller or telemarketer to make a false or misleading statement to induce a person to pay for goods or services or to induce a charitable contribution.  16 C.F.R. § 310.3(a)(4).

59.     It is a fraudulent charitable solicitation, a deceptive marketing act or practice, and a violation of the TSR for any seller or telemarketer soliciting charitable contributions to misrepresent, directly or by implication:

   a.     the nature, purpose or mission of any entity on behalf of which a charitable contribution is being requested;

   b.     the purpose for which a charitable contribution will be used; or

   c.     the percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program.

16 C.F.R. § 310.3(d)(1), (3), and (4).

60.     It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the Rule. 16 C.F.R. § 310.4(b).

61.     Among other things, the 2003 amendments to the TSR established a do-not-call registry of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the National Do Not Call Registry without charge either through a toll-free telephone call or over the Internet at _donotcall.gov_.

62.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at _donotcall.gov_, or by otherwise contacting law enforcement authorities.

17

63.    The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at *telemarketing.donotcall.gov*, to pay the fee(s) if required, and to download the numbers not to call.

64.    Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(u).

65.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

66.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to any consumer when that consumer previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered, or made by or on behalf of the charitable organization for which a charitable contribution is being solicited. 16 C.F.R. § 310.4(b)(1)(iii)(A).

67.    The TSR prohibits sellers and telemarketers from abandoning any outbound telephone call. A telephone call is considered "abandoned" if a person answers it and the person who initiated the call does not connect the call to a sales representative within two (2) seconds of the person's completed greeting. 16 C.F.R. § 310.4(b)(1)(iv).

68.    The TSR prohibits sellers and telemarketers from failing to transmit or cause to be transmitted to caller identification services the telephone number and name of the telemarketer making the call, or the customer service number and name of the seller. 16 C.F.R. § 310.4(a)(7).

69.    It is an abusive telemarketing act or practice and a violation of the TSR for a telemarketer making an outbound telephone call to fail to promptly, truthfully and in a clear and conspicuous

manner disclose the identity of the seller, that the purpose of the call is to sell goods or services, and the nature of the goods or services.  16 C.F.R. § 310.4(d).

70.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### *Making False Statements in Connection with Telemarketing*

71.     In numerous instances, in the course of telemarketing for sales of FFF products or charitable contributions, Defendants in the Family Films Enterprise have made false or misleading statements to induce consumers to pay for goods, or to induce a charitable contribution, including, but not limited to, the misrepresentations described in Paragraph 54.

72.     The practices of Defendants in the Family Films Enterprise alleged in Paragraph 71 are deceptive telemarketing practices that violate the TSR, 16 C.F.R. § 310.3(a)(4), 310.3(d)(1), (3), (4).

## COUNT III
### *Violating the National Do Not Call Registry*

73.     In numerous instances, in connection with telemarketing, Defendants in the Family Films Enterprise engaged in or caused others to engage in initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT IV
### *Ignoring Entity-Specific Do Not Call Requests*

74.     In numerous instances, in connection with telemarketing, Defendants in the Family Films Enterprise engaged in or caused others to engage in initiating an outbound telephone call to a person who has previously stated that he or she does not wish to receive such a call made by or on behalf of the seller whose goods or services are being offered, or on behalf of the charitable organization for which a charitable contribution is being solicited, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

## COUNT V
### *Failing to Transmit Information to Caller Identification Services*

75.     In numerous instances, in connection with telemarketing, Defendants in the Family Films Enterprise have failed to transmit or cause to be transmitted to caller identification services the telephone number and name of the telemarketer making the call, or the customer service number and name of the seller, in violation of the TSR, 16 C.F.R. § 310.4(a)(7).

## COUNT VI
### *Failing to Make Required Oral Disclosures*

76.     In numerous instances, in the course of telemarketing products and services, Defendants in the Family Films Enterprise have made or caused telemarketers to make outbound telephone calls in which the telemarketer failed to disclose promptly and in a clear and conspicuous manner to the person receiving the call:

        a.      the identity of the seller;

        b.      that the purpose of the call is to sell goods or services; or

        c.      the nature of the goods or services.

77.     The practices of the Defendants in the Family Films Enterprise alleged in Paragraph 76 are an abusive telemarketing practices that violate Subsections 310.4(d)(1), (2), and (3) of the TSR, 16 C.F.R. § 310.4(d)(1), (2), (3).

**COUNT VII**
*Abandoning Calls*

78.     In numerous instances, in connection with telemarketing, Defendants in the Family Films Enterprise have abandoned, or caused others to abandon, an outbound telephone call by failing to connect the call to a sales representative within two (2) seconds of the completed greeting of the person answering the call, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iv).

**INJURY TO THE PUBLIC INTEREST**

79.     Consumers and potential donors in the United States have suffered and will suffer injury as a result of Defendants' violations of Section 5(a) of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and potential donors, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

80.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other equitable and ancillary relief as it may deem appropriate to prevent and remedy any violation of any provision of law enforced by the FTC, including an order that a wrongdoer disgorge its ill-gotten gains.

81.     Defendants have violated the TSR as described above with knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is

21

prohibited by the Rule, as set forth in Section 5(m)(1)(A) of the FTC Act, 15 U.S.C.

§ 45(m)(1)(A).

82.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4

of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended,

and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil

penalties of up to $11,000 for each violation of the TSR on or before February 9, 2009, *see* 16

C.F.R. § 1.98(d) (2009), and up to $16,000 for each violation of the TSR after February 9, 2009.

74 Fed. Reg. 857 (Jan. 9, 2009).

83.     This Court, in the exercise of its equitable jurisdiction, may award ancillary relief to

remedy injury caused by Defendants' violations of the TSR and the FTC Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court, as authorized by Sections 5(a),

5(m)(1)(A), and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), and 53(b), and pursuant

to its own equitable powers:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to

avert the likelihood of consumer injury during the pendency of this action and to preserve the

possibility of effective final relief, including but not limited to temporary and permanent

injunctions;

B.     Enter judgment in favor of Plaintiff and against Defendants for each violation alleged in

the Complaint;

C.     Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by

Defendants;

D.      Award such relief as the Court finds necessary to redress injury resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, the disgorgement of ill-gotten monies, rescission or reformation of contracts, restitution, and the refund of monies paid;

E.      Award Plaintiff monetary civil penalties against each Defendant for each violation of the TSR alleged in Counts II through VII of this Complaint.

F.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: May 5, 2011

OF COUNSEL:

LOIS C. GREISMAN
Associate Director for Marketing Practices
FEDERAL TRADE COMMISSION

Michael E. Tankersley
Arturo DeCastro
Attorneys
Federal Trade Commission
600 Pennsylvania Ave., NW, Rm. 286
Washington, DC  20580
PHONE:  202-326-2991
FAX:  202-326-3395
mtankersley@ftc.gov

Respectfully submitted,

FOR THE UNITED STATES OF
AMERICA

TONY WEST
Assistant Attorney General
MAAME EWUSI-MENSAH FRIMPONG
Acting Deputy Assistant Attorney General
Civil Division
U.S. DEPARTMENT OF JUSTICE

PAMELA C. MARSH
United States Attorney
PETER FISHER
Assistant U.S. Attorney for the Northern
District of Florida
111 North Adams St.
Fourth Floor, US Courthouse
Tallahassee, FL 32301
PHONE: 850-942-8430

KENNETH L. JOST
Acting Director
Office of Consumer Protection Litigation

s/  Daniel M. Baeza
DANIEL M. BAEZA
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
PHONE: 202-616-4916
FAX: 202-514-8742
dan.baeza@usdoj.gov